IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **CAROLYN BAYLESS,**<br><br>             **Plaintiff,**<br><br>vs.<br><br>**THE UNITED STATES OF AMERICA, et al.,**<br><br>             **Defendants.** | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:09CV495DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant the United States of America's Motion for Summary Judgment. The court held a hearing on the motion on April 19, 2012. At the hearing, Plaintiff was represented by Steven Russell, and Defendant was represented by Jeffrey E. Nelson. The court heard oral argument and took the motion under advisement. After carefully considering all pleadings, memoranda, and other materials submitted by the parties, and the law and facts relevant to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Carolyn Bayless filed a notice of claim with the United States Army on January 31, 2008. The claim alleges that Bayless was injured when she was exposed to toxic substances while working on Utah State lands near Dugway Proving Grounds in 1997. Bayless alleges that the Army negligently exposed her to these substances.

Bayless has a degree in conservation biology with a wildlife emphasis. From late April through September or October 1997, Bayless was part of a range crew for the Utah Division of Wildlife Resources ("DWR") that conducted plant and wildlife studies in various remote areas of Utah. During that summer, Bayless was in the west desert area of Utah for two to three weeks. While working in the west desert, she was within eight to ten miles of Dugway Proving Ground and within two miles of Tooele Army Depot and Deseret Chemical Depot.

A few weeks after she completed her field work with the DWR range crew, Bayless began to experience unusual symptoms. In October and November 1997, she experienced lip numbness. In February 1998, the entire left half of her body went numb. Plaintiff has experienced neurological symptoms continually since that time.

In May 1998, Bayless began a series of visits to neurologists. Initially, the results of tests were normal. Nonetheless, she began to experience dizziness, weakness, and fatigue. In February, 1999, a neurologist at the University of Utah diagnosed Bayless with multiple sclerosis. However, the medication prescribed only worsened her condition. In March 2000, after a miscarriage and related surgery, Bayless described her condition as nonfunctional and she has been unable to maintain employment since that time.

In July 2000, Bayless was evaluated by a neurologist at Loyola University in Chicago, who concluded that she was not suffering from multiple sclerosis and her symptoms were psychosomatic. In October 2000, a neurologist at the Mayo Clinic in Arizona evaluated Bayless. This doctor also concluded that she was not suffering from multiple sclerosis and advised her that her symptoms would probably go away without further treatment. But Bayless' symptoms did not go away.

In October 2000, Dr. Judith Moore diagnosed Bayless with chronic Epstein-Barr and treated her with vitamins and supplements. In August 2001, Bayless gave birth to a daughter. Bayless did not seek treatment for her symptoms again until October 2002, when she saw a chiropractor in Colorado. By this time, Bayless had begun to consider the possibility that her symptoms might have something to do with her work on the DWR crew during the summer of 1997. In her Patient Admittance Form with chiropractor Beau Mauldin, she reported that she had "worked in desert of southern Utah (nuclear testing used to be done in past) for 6 months before getting sick–stopped working Oct. 1st 1997–starting numbness in mouth by late October/early Nov. 1997."

In 2003, Bayless was referred to Sam Queen, a clinical nutritionist in Colorado Springs. In the "Possible Exposure" section of her patient information form, Bayless wrote, "I think I may have been exposed to uranium in the soil of southern Utah when I worked for the Division of Wildlife for 6 months." Queen did an analysis of Bayless' blood and told her that it revealed "organophosphate pesticide poisoning." Queen attempted to treat the condition, but Bayless did no further research into her condition or what caused the organophosphate pesticide poisoning. Bayless has continued to receive treatment from Queen, with the exception of approximately one year, since 2003.

Bayless did not investigate the source of her exposure until early 2005 when she read a magazine article about a woman who had experienced similar symptoms after visiting an Army base. She contacted the woman in the article and she referred Bayless to Dr. Garth Nicolson, a professor who studies biological weapons. Bayless began to investigate the possibility that her exposure was a result of her proximity to the testing and incineration of chemical and biological

3

weapons at Dugway Proving Grounds.  Bayless did internet research about the activities at Dugway.  She also began to provide information to her healthcare providers regarding the connection between her neurological symptoms and the substances she may have been exposed to near Dugway or the other Army facilities.

On February 9, 2005, Bayless saw Dr. Dennis Remington, a Provo physician who had treated her periodically for several years.  Dr. Remington recorded the information as follows: "Discuss new ideas.  States [history] of employment on Range Crew Forestry/Desert service and started to get sick [with] neurological [symptoms] 3 months after starting – adjacent to Dugway, Toelle [sic] Depot, Deseret Chemical Depot sites."  However, Bayless does not recall whether Dr. Remington recommended any treatment at that time.

Also in February 2005, Bayless told her nutritionist, Queen, about what she had learned.  Queen's office wrote to Bayless that her symptoms could be consistent with exposure to nerve agents.  Queen suggested that Bayless could obtain further evaluation or treatment from the Institute of Orthomolecular Medicine, by Bayless did not do so.  Bayless and Queen, however, agreed to "explore" whether Bayless had been exposed to a nerve agent.  Bayless provided Queen with more information.

Bayless also followed up with Professor Nicolson.  He suggested that Bayless could take a test for biological weapon exposure known as the polymerase chain reaction ("PCR") test.  Bayless, however, decided not to undergo the PCR test at that time because she believed there was a debate as to its accuracy.  Professor Nicolson also referred Bayless to Major Craig Lynch, an officer at Dugway with whom Nicolson had consulted regarding Gulf War illness.  Bayless does not recall ever contacting Major Lynch.

Sometime in early 2005, Bayless also contacted Dr. Robert Moody, a physician in Draper, Utah, to assist her in evaluating whether her symptoms were related to exposure to chemical or biological agents. Bayless provided Dr. Moody with Major Lynch's contact information and asked Dr. Moody to obtain information from him. Bayless does not know whether Dr. Moody ever spoke to Major Lynch.

Bayless saw Dr. Moody in March 2005 and provided him with all the information she had learned from her research. He noted that all her symptoms were preceded by working near Dugway with exposure to nerve gas. Bayless saw Dr. Moody again on April 12, 2005, and he again noted that she may have been exposed to nerve gas being destroyed at Tooele Army Depot.

On May 3, 2005, Bayless asked Dr. Moody to administer a test for acetylcholine, which she understood would indicate whether she had been exposed to organophosphates. The test was negative, and Bayless stopped working with Dr. Moody.

Bayless' internet research in early 2005 also led her to a man named Gary Harris, who had worked at Dugway around the time that Plaintiff had worked near Dugway on the DWR crew. Harris told Bayless that he had been exposed to certain nerve agents and described his symptoms, which were similar to the symptoms Bayless had been experiencing.

On May 4, 2005, Bayless sent an email to her nutritionist, Queen, with a summary of information she had obtained from Harris. She wrote: "I now am pretty sure that my symptoms were caused by low-level exposure to nerve agents, probably VX and GB (sarin nerve gas). I spoke with a man who was working on the prototype incinerator out at Dugway Proving Ground and was exposed to nerve agents in 1996. His symptoms are similar to mine with the brain fog, numbness, muscle weakness, and chronic fatigue. . . . He said if I was downwind I could have

been exposed.  Plus they were probably leaking nerve agent before they found them. . . . I've also found out there is a lot of neurological problems in employees that have worked at the Tooele Chemical Depot where the largest nerve gas incinerator in the world is operating. I also spent two weeks just outside the border of the Chemical Depot in 97.  Hopefully this new information will help with my case."

Sometime between July and October 2005, Queen suggested that she try to treat her symptoms with an herb called huperzine.  Queen told her that huperzine would neutralize the effects of sarin nerve gas exposure.  Bayless took huperzine for three days but saw no improvement.  She concluded from this experiment that her symptoms probably were not linked to chemical weapons exposure near Dugway.  She ceased seeing Queen at that time.

In 2006, Bayless began working with a nutritionist in Park City, named Pat Montague. Montague told Bayless that her symptoms were the result of a candida infection in her intestinal tract.  At Montague's suggestion, Bayless adhered to a strict "candida diet," but her neurological symptoms did not improve.  As a result, Bayless again decided to explore a connection with exposure to nerve agents near Dugway.

In October or November 2006, Bayless visited Dr. Todd Mangum, a physician in Salt Lake City.  Dr. Mangum administered the PCR test that Professor Nicolson had recommended to Bayless a year and a half before.  The test was negative so Bayless again "ruled out biological weapons."

In December 2006, however, Bayless again decided to explore the Dugway connection with Dr. William Rea in Dallas, Texas.  Bayless saw Dr. Rea on February 5, 2007, and told him that she strongly suspected that she had been exposed to sarin nerve gas at Dugway.  Dr. Rea

administered a test for acetylcholine, which had been negative when Dr. Moody tested it in 2005. But this time the test was positive. Dr. Rea told Bayless that she had organophosphate pesticide toxicity, the same diagnosis that Queen had given her as result of her blood work in 2003. Based on Dr. Rea's diagnosis, Bayless concluded that she could link her condition to Dugway and she started looking for an attorney. Bayless also began seeing Queen again for help in treating her condition.

Approximately a year later, Bayless' attorney filed an administrative claim with the Army, dated January 31, 2008, and received by the Army on February 5, 2008.

## DISCUSSION

The United States moves for summary judgment seeking an order dismissing Plaintiff's Complaint with prejudice for failing to present her claim to the United States Army within two years of the accrual of her claim, as required by 28 U.S.C. § 2401(b). Under 28 U.S.C. § 2401(b), if a notice of claim is not filed within two years of the accrual of the claim, the court lacks subject matter jurisdiction over the claim.

The Federal Tort Claims Act ("FTCA") is a limited waiver of the federal government's sovereign immunity. *Dahl v. United States*, 319 F.3d 1226, 1228 (10th Cir. 2003). One of the conditions of that waiver is the two-year statute of limitations: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). If a claimant fails to present her claim within two years of its accrual, the court lacks subject-matter jurisdiction over the claim. *Dahl*, 319 F.3d at 1228.

The FTCA's two-year statute of limitations reflects "a pervasive legislative judgment that

it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States v. Kubrick*, 444 U.S. 111, 117 (1979) (citation omitted).  The statute protects both the government and the court "from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Id.* (citations omitted).

Although the statute does not define "accrual," courts have held that a tort claim generally accrues when the plaintiff's injury occurs. *Plaza Speedway Inc. v. United States*, 311 F.3d 1262, 1267 (10th Cir. 2002) (citing *Kubrick*, 444 U.S. at 120). "Federal law controls the issue of when a federal cause of action accrues." *Id.*   In *Kubrick*, the United States Supreme Court adopted the application of the discovery rule in medical malpractice and latent injury cases.  444 U.S. at 120.

In cases since *Kubrick*, the Tenth Circuit has also adopted the *Kubrick* rule that the "discovery rule" applies "where a reasonably diligent plaintiff could not immediately know of the injury and its cause." *Cannon v. United States*, 338 F.3d 1183, 1190 (10th Cir. 2003) (citation omitted).  "In that instance, an FTCA claim accrues at the time when a reasonably diligent plaintiff would have known of the injury and its cause. . . . For FTCA purposes, '[a] claimant is aware of the injury once . . . apprised of the general nature of the injury.  Lack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute.'" *Id.* (citations omitted).  The Tenth Circuit has also explained that it will depart from the general definition of accrual only in an "'exceptional case in which the plaintiffs could not have immediately known of [their] injury.'" *Dahl*, 319 F.3d at 1229 (citing *Plaza Speedway*, 311 F.3d at 1268).

The discovery rule is an objective standard.  *Arvayo v. United States*, 766 F.2d 1416,

8

1422 (10th Cir. 1985). Thus, the statute of limitations begins to run when a reasonably diligent person in the claimant's position would have reason to suspect that her injury might have been caused by the government's activity. *Plaza Speedway*, 311 F.3d at 1271. Other circuits have explained that this does not mean that the claimant must be certain of the cause of her injury, or even that she have enough information to believe that government activity was more likely than not the cause of her injury. *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986). Nor must the claimant know that the government was negligent. *Kubrick*, 444 U.S. at 123. Rather, the claim accrues once the claimant has sufficient information to believe that government activity was a potential cause of her injury. *Nemmers*, 795 F.2d at 631. At that point, the statute allows the claimant two years in which to investigate her claim, consult experts, obtain legal counsel, and file her claim. *Kubrick*, 444 U.S. at 123-24; *Plaza Speedway*, 311 F.3d at 1271.

Bayless became aware of her injuries soon after working on the DWR crew. Therefore, this case turns on when Bayless had adequate information regarding the cause of her injuries for the statute to start running. In *Plaza Speedway*, the Tenth Circuit explained that a court must first determine whether the facts of the case dictate the application of the general occurrence rule or whether it is an exceptional case in which the plaintiff could not have immediately known of the injury. 311 F.3d at 1268. If the court determines it is an exceptional case, then the court decides when the plaintiff discovered her injury. *Id.* Once the court decides when the plaintiff determined her injury, the "second question–when [the plaintiff] discovered the Army may have polluted its property–must be answered in light of the purpose of the statute of limitations and the court's corresponding duty." *Id.* The court "must consider what is fair to the Plaintiff but also decide 'in a manner which neither extends nor narrows the waiver Congress intended.'" *Id.*

(quoting *Arvayo*, 766, F.2d at 1419).   The court acknowledged that "underlying the question of law in this appeal–subject matter jurisdiction–is a question of fact, namely when the [plaintiffs] knew or should have known of the contamination." *Id.* at 1270.  The court held that when the plaintiffs learned that they had contaminants in their well, they had reason to suspect that the source was their only neighbor, the Army, which they knew used fuel, solvents, and various chemicals.  *Id.* at 1270-71.  The court then stated that "the two years thereafter was adequate time for them to initiate inquiry into any possible harm." *Id.* at 1271.  Accordingly, the court found that the claim had not been filed timely and it remanded the case to the district court with instructions to dismiss the complaint for lack of subject matter jurisdiction.  *Id.*

In *Cannon*, the Tenth Circuit reversed a district court's award of damages in an FTCA claim, finding that the claim was barred by the FTCA's two-year limitations period.  338 F.3d at 1191-92.  The plaintiffs in *Cannon* claimed that their property had been contaminated by chemical and other weapons.  The court noted that in *Plaza Speedway* it had found that knowledge of property contamination and knowledge that the army base nearby had used chemical substances was "adequate knowledge of their injury and its cause to warrant further investigation." *Id.* at 1191.  In *Cannon*, the court found that a meeting where the government admitted to prior testing and the presence of toxic chemicals, provided the plaintiffs with adequate knowledge about their injury and its cause to commence the running of the statute of limitations.  *Id.*  The court found that plaintiffs should have sought counsel and initiated their own investigation rather than wait for the government to notify them of the extent of their injury.  *Id.* at 1192.  The court found that the *Plaza Speedway* decision "compels us to conclude that the discovery rule, even if applicable, did not toll the two-year limitations period beyond the date of

the [meeting]."

In this case, Bayless began experiencing unusual neurological symptoms within weeks after she completed her work on the DWR range crew in remote areas of Utah in 1997. She testified that she had enjoyed good health throughout her life to that point. Under the general rule applicable to all but exceptional cases, Bayless' claim would have accrued when she began suffering injuries in 1997. However, the accrual of Bayless' claim would be deferred under the discovery rule if her injury were "'unknowable by its very essence, i.e., its existence at the critical moment simply [could not] be ascertained.'" *Cannon*, 338 F.3d at 1190 (citation omitted). In that instance, an FTCA claim arises at the time a reasonably diligent plaintiff would have known of the injury and its cause. *Id.* As in *Cannon*, the statute of limitations in Bayless' case began to run no later than when she was informed that it was "highly probable" that her injuries were the result of government action. *Id.*

In the fall of 1997, Bayless began experiencing unusual neurological symptoms a few weeks after she had been working on the DWR range crew and, specifically, in the West Desert. But she received several conflicting opinions from doctors and other professionals from whom she sought help. Although she began to exhibit symptoms within months of her alleged exposure in the summer of 1997, it was impossible for her know of her exposure and for her to connect her symptoms to such exposure. She did not connect her symptoms to her work on the DWR range crew until 2002. In October 2002, when Bayless first saw Dr. Mauldin, and in April 2003, when she first saw Mr. Queen, she suggested to them the possibility that she may have been exposed to uranium while she worked in southern Utah in 1997. In 2003, she received her first test result from Queen indicating that her blood showed organophosphate pesticide poisoning. However, it

11

was not until 2005 that Bayless' focus shifted to the claim she now asserts: that she was exposed to chemical or biological weapons when she worked near Dugway Proving Ground in 1997. In 2005, Bayless learned the following information:

- The woman that Bayless read about in a magazine told Bayless that she had suffered symptoms similar to Bayless' after visiting an Army base, where she believed she was exposed to biological weapons.
- Bayless learned through internet research that chemical and biological weapons testing and destruction had occurred at Dugway Proving Ground while she was working nearby.
- Queen had suggested that her condition could be related to exposure to a neurotoxin. He had already found in 2003 that her bloodwork revealed organophosphate pesticide poisoning.
- Dr. Garth Nicolson, a professor with knowledge of biological weapons, advised Bayless about testing for exposure to biological weapons and referred her to Major Craig Lynch at Dugway for further information.
- Gary Harris told Bayless that he had worked on the incinerator at Dugway and had experienced symptoms similar to Bayless' after exposure to nerve agents at Dugway. Harris provided detailed information about activities at Dugway and told Bayless that she could have been exposed to nerve agents when she worked near Dugway in 1997.
- Bayless wrote to Queen that "I now am pretty sure that my symptoms were caused by low-level exposure to nerve agents, probably VX and GB (sarin nerve

gas)."

A tort claim against the federal government accrues when a reasonably diligent person in the claimant's position would have had reason to suspect that her injury might have been caused by government activity. *See, e.g., Plaza Speedway*, 311 F.3d at 1271 (property owners' knowledge of chemical contamination on their property, together with knowledge that the Army had used chemical substances on adjacent property, was sufficient to start the running of the two year statute of limitations on their claim against the Army). Under the discovery rule, the court concludes that Bayless' claim accrued no later than May 2005, when she stated that she had reason to believe that Army activity was a potential cause of her neurological symptoms. At that time, she stated to Queen that she was "pretty sure" it was the cause of her problems. That information was enough to give Bayless "reason to suspect the source [of her symptoms] might have been" the activities at Dugway. *Plaza Speedway*, 311 F.3d at 1271.

"The two years thereafter was adequate time for [her] to initiate inquiry into any possible harm." *Id.* In fact, Bayless did continue to investigate her claim throughout that period. She tried an herb to alleviate the symptoms and she was tested several times by several doctors. Bayless' positive test from Dr. Rea, which she agrees confirmed the link to her, was within the two year period and was merely a confirmation of a blood test she received from Queen in 2003. If the two year period began to run in May 2005, when Bayless stated to Queen that her research had led her to be "pretty sure that [her] symptoms were caused by low-level exposure to nerve agents," she still had three months to contact an attorney and file a claim after her positive test result from Dr. Rea before the limitations period expired in May 2007. Bayless, however, waited almost another year to file her claim.

13

Bayless claims that she began to doubt the Dugway connection when the herbal supplement did not alleviate her symptoms and when she received a negative result from a "biological weapons test" in 2006. However, even if Bayless now believes that she received erroneous information about the cause of her symptoms and, therefore, was dissuaded from pursuing her claim for a time, that did not toll the running of the statute.

> [A claimant] may be incompetently advised or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.

*Kubrick*, 444 U.S. at 124 (emphasis added).

In May 2005, after knowing that her blood work had tested positive for organophosphate pesticide poisoning, speaking with several people with similar symptoms who had been exposed to nerve agents, finding out information from the internet and former employees regarding the activities at Dugway, and having her nutritionist confirm that her blood work and symptoms could be the result of exposure to nerve agents, Bayless stated that she was pretty sure that the cause of her symptoms was exposure to nerve agents near Dugway. The United States does not concede that the information Bayless obtained throughout her investigation was accurate or that Bayless was exposed to nerve agents or other substances from Army activities. However, such a disagreement does not affect the analysis of whether Bayless' administrative claim was timely.

The issue of liability is often disputed, but the accrual of a claim under the discovery rule does not depend on the claimant's ability to prove negligence. *Kubrick*, 444 U.S. at 123-24. Bayless confuses the standard for accrual of her claim with the requirements for commencing a legal proceeding. The accrual of Plaintiff's claim was not dependent on her ability to prove her claim against the government. *Kubrick*, 444 U.S. at 123. Rather, Plaintiff's claim accrued when she had reason to suspect that her symptoms might have been caused by exposure to toxic agents near Dugway. *Plaza Speedway*, 311 F.3d at 1271 (holding that the plaintiff's claim accrued when "they had reason to suspect the source [of their property contamination] might have been the neighboring [government] property").

As the court has stated, the knowledge that Bayless acquired in 2005 regarding both her symptoms, her symptoms' similarity to others exposed to similar toxins, and the activities at Dugway gave her ample reason to suspect a link between the two. By May 2005, when Plaintiff stated that she was "pretty sure that [her] symptoms were caused by low-level exposure to nerve agents," her claim accrued and she had two years to consult with competent medical and legal experts to determine whether she had sufficient information to pursue a legal remedy under the FTCA. *Kubrick*, 444 U.S. at 123-24. Despite her present claim that her suspicions about exposure were torpedoed by contrary medical opinions, Bayless continued to explore the connection and continued to seek testing from new doctors. The fact that she received a favorable opinion from Dr. Rea in February of 2007–within the two year period of her claim accrual–demonstrates that the two-year period is adequate. Bayless would have still had three months until May 2007 to file a claim. Her failure to do so makes her claim untimely and deprives this court of subject matter jurisdiction over her case. *See Cannon*, 338 F.3d at 1190;

15

*Plaza Speedway*, 311 F.3d at 1271.

Bayless argues that in addition to applying the discovery rule, the court should also apply the doctrine of equitable tolling. She asserts that if the court determines that her suspicions about the exposure to nerve agents in 2005 triggered the statute of limitations, the court should consider applying equitable tolling to the statute of limitations.

Bayless argues that in *Irwin v. Department of Veterans' Affairs*, 498 U.S. 1075 (1990), the Court stated that statutes of limitation in actions against the government are subject to the rebuttable presumption of equitable tolling. Bayless concedes that equitable tolling is to be applied sparingly and only in extraordinary circumstances. She acknowledges that she has not been able to find directly analogous precedent, but she believes this is a case where equitable tolling is justified.

Bayless relies on *Irwin*, in which the Court held that the principle of equitable tolling could be applied to the 30-day statute of limitations for Title VII employment discrimination claims against the government. However, in subsequent cases, the Court has made clear that the presumption of equitable tolling is rebutted where the statutory language and legislative history show that Congress did not intend to allow equitable tolling of the statute at issue. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008) (equitable tolling does not apply in claims against the United States in Court of Federal Claims); *United States v. Beggerly*, 524 U.S. 38 (1998) (equitable tolling does not apply to Quiet Title Act); *United States v. Brockamp*, 519 U.S. 347 (1997) (equitable tolling does not apply to Internal Revenue Code statute of limitations governing tax refund claims).

This court has held that equitable tolling is not applicable to FTCA claims. *Wukawitz v.*

*United States*, 170 F. Supp. 2d 1165, 1169-70 (D. Utah 2001) (Kimball, J.), *Alsup v. United States*, 2006 WL 2666410 (D. Utah Sept. 14, 2006) (Stewart, J.). This court held that the *Irwin* presumption of equitable tolling does not apply to FTCA claims because it would be inconsistent with the language and legislative history of the FTCA's statute of limitations. 170 F. Supp. 2d at 1167-69.

Plaintiff implies that the Tenth Circuit has recognized the applicability of equitable tolling, but the Tenth Circuit has not addressed or directly ruled on the issue. The Tenth Circuit has only summarily held in unpublished decisions that, in any event, equitable tolling would not apply under the facts of those cases. *In re Peterson*, 6 Fed. Appx. 837 (10th Cir. 2001), *Trobaugh v. United States*, 35 Fed. Appx. 812 (10th Cir. 2002). Since this court's decision, other circuit courts have split on the issue. The Ninth Circuit has held that the FTCA's statute of limitations is a jurisdictional prerequisite to suit and, therefore, not subject to equitable tolling. *Marley v. United States*, 567 F.3d 1030, 1038 (9th Cir. 2009). However, the Third and Eighth Circuits have allowed equitable tolling of the FTCA's statute of limitations for differing reasons. *See Santos v. United States*, 559 F.3d 189, 194-97 (3rd Cir. 2009), *T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 961 (8th Cir. 2006).

Even if the court applied equitable tolling, it is only to be applied sparingly in circumstances such as where the claimant filed a defective pleading within the statutory period or where the claimant had been induced or tricked by the adversary's misconduct into allowing the deadline to pass. *See Irwin*, 498 U.S. at 96. Based on the facts before the court, neither ground applies in this case.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED. Therefore, this action is dismissed with prejudice, each party to bear its and her own costs.

DATED this 17th day of May, 2012.

> BY THE COURT:
>
> _____
> DALE A. KIMBALL
> United States District Judge